Hat, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
This is a suit brought by the plaintiff, who was the contractor for the extension of Dry Dock No. 3, navy yard, Norfolk, Ya. The suit is not brought for extra work done outside of the terms of the contract. It is based entirely upon allegations that officers of the United States threw various obstructions in the way of the plaintiff and thus caused him to do a large amount of extra work which properly came under the terms of the contract.
The plaintiff made the lowest bid for this work. The contract price was $533,784. The plaintiff claims that he expended in the performance of the work $671,301.45 ($137,517.45 in excess of the contract price). This large amount was expended, according to the contention of the claimant, notwithstanding the fact that no unforeseen accidents occurred in the progress of the work; that there was no rise in the price of materials, nó difficulty was had in obtaining them; and that there were no delays in completing the work, which was completed within the time specified by the contract.
The plaintiff in the face of these circumstances attributes his loss to the actions of the officers of the United States and insists that the defendants should be required to make good to bim his losses. The plaintiff has set out five distinct causes of loss, which he alleges were brought about by the defendants’ officers, and for the sake of convenience these different causes will now be examined in the order in which they appear in the findings.
1. Eestrictions in access to site of work. The plaintiff claims that he has lost on this account $25,828.09. The specifications provided: “The party of the first part will be allowed a clear space at the site of the work within the limits designated on the plans. The commandant will afford such use of present piers and wharves for the purpose of hauling material or as otherwise may be necessary to the prosecution of the work as are not incompatible with the interests of the United States.” It was also provided: “Unless otherwise specifically stated, the party of the first *7 part shall be allowed such reasonable space at the site of the work as the party of the second part is able to provide and access to the same for receiving, hauling, storing, and working material.” It was also provided that the plaintiff should carry on his work without interfering with the ordinary use of the streets or with the operations of other contractors and that the defendants must not be hindered or delayed in any work being done by them. The commandant of the navy yard had charge of and regulated the access to the yard and to the site of the work. This was a military function, and from the evidence it appears that the commandant of the yard exercised it in good faith. The rules and regulations as to the admission of the employees of the plaintiff to the yard and as to the use of certain gates and certain streets for hauling seem reasonable enough. Two or three hundred men were employed by the plaintiff; they worked night and day. There were large amounts of Government property in the navy yard, and it was necessary that some supervision should be had over the large number of people who were going to and fro constantly. Nor does it appear that the steps taken by the commandant were unreasonable; nor does it appear that these unduly interfered with the work of the plaintiff. Certainly at the time of these transactions the plaintiff did not think that he was being interfered with to such an extent as to cause him to lose money, for he did not avail himself of his right to protest to the Chief of the Bureau of Yards and Docks. It is not reasonable to suppose that the commandant of the yard would have arbitrarily made regulations which would have interfered seriously with the work of the plaintiff, and had he done so he would not have been sustained in such interference if his action had been brought to the attention of the chief of the bureau. It is therefore apparent that the plaintiff is not entitled to recover under this item.
2. (a) The first complaint of the plaintiff under this head is that the experiments for determining the proportions of the ingredients in the concrete were not conducted in accordance with the specifications in that the engineer in charge of the work did not personally supervise the experiments; and that the formula adopted did not comply with *8 the requirements of the specifications. These contentions of the plaintiff are not borne out by the evidence. While the engineer in charge was not personally present at all of the experiments, yet he did personally test these experiments, and directed new experiments to be made, until he was satisfied that the proper formula had been obtained. The mixture adopted was the densest and strongest mixture possible, and it was in accordance with the specifications, which provided: “It is the intention of the party of the second part to obtain a concrete as dense as possible, using such aggregates complying with the specification requirements as are obtainable.”
(5) Another claim is that the plaintiff went to great expense to procure machinery for depositing the concrete, and that the officer in charge of the work became dissatisfied with the operation of this machinery, and arbitrarily ordered it to be taken down, although the plaintiff claims that this machinery was approved by the engineer in charge of the work. The plaintiff claims that he lost by this arbitrary action of the engineer the sum of $23,958.81. It-is true that the plaintiff installed this machinery, but it does not appear that the engineer in charge of the work approved of this machinery in the sense that he told the plaintiff that it would be proper for the placing of the concrete; he did examine the designs and plans for it, and only consented that it should be used as an experiment. He permitted the plaintiff to try it, and gave the plaintiff every facility to test its capacity for the work; the machinery did not perform the work properly, and the engineer officer said so, as it was his duty to do. He did not order the machinery to be taken down, but the plaintiff abandoned it of his own volition, as it was necessary he should do, the specifications providing that methods of construction shall be “open to such suggestion and comment as in the opinion of the officer in charge are deemed necessary in the interest of the work, and in the event of. the proposed outline or any features thereof being inimical to the interests of the United States, or evidently insufficient to accomplish the results intended, may be disapproved, whereupon a different method and plans shall be submitted by the party of the first part. In any event the *9 party of the first part shall be held entirely responsible for the sufficiency of the proposed methods of construction.” It seems, therefore, that the engineer in charge of the work had full power to exercise his discretion as to the availability of this machinery for the work. Of course, it was his duty to exercise that discretion fairly, with an honest purpose to take care of the interest of the United States. After carefully considering all the evidence on this phase of the case the court is satisfied that the engineer in charge of the work acted with perfect good faith in this matter, and was neither arbitrary or unreasonable in his decision.
(o) The plaintiff complains that he was put to great expense by the requirement of the engineer in charge that he should lay the concrete in layers of 2 feet in thickness, and that no more should be placed thereon until those 2 feet had remained in place for 12 hours. This requirement was in accordance with the specifications and did not cause any delajr which interfered with the plaintiff’s work; nor was the plaintiff put to greater cost thereby. The plaintiff did not make a protest as to the action of the engineer in charge, as required by the specifications.
3. The next complaint is that the plaintiff was put to great expense by reason of the failure of the defendants to notify bim when he could get possession of the dry dock for the purpose of removing the head. The plaintiff gave notice on April 24, 1911, that he wanted possession of the dry dock on May 4, 1911, and he was given possession of it on May 3, 1911, at midnight. There was some correspondence with regard to this, and some doubt created in the mind of the plaintiff as to whether or not he could get possession of the dry dock on May 4,1911, and he says that in consequence of this doubt he was prevented from hiring a certain type of scow, which if he could have hired would have saved bim money and labor. But it appears from the evidence that he did not try to hire these scows until April 24, 1911, the day he notified the defendants he would require possession of the dry dock on May 4, 1911. He told the company he wanted them, but put off from time to time making a contract for them until it was too late to get them. Moreover, the defendants were not responsible for his failure to hire *10 these scows. If he had hired them and the defendants had by its action in delaying his work caused him loss or damage, his complaint might receive consideration.
4. We next come to consider the complaint of the plaintiff as to the granite. These complaints deal with the inspection of the engineer in charge, alleged want of wharf space, unnecessary re-dressing and pointing, and rejection of stones which had been favorably passed upon by the inspector at the quarry. The stone was furnished to the plaintiff by the Eockport Granite Co., Eockport, Mass., and the United States had an inspector at Eockport. to inspect the stone before it left the Eockport quarries. The specifications provided that “ Materials manufactured elsewhere than on the site of the dock will, upon application by the party of the first part and approval by the Chief of the Bureau of Yards and Docks, be inspected at the point of manufacture, subject to reinspection at the site as to deterioration and injury during transportation.” They also provided: “ The officer in charge shall have power to reject material and workmanship which are not in accordance with the contract, * * * provisional acceptance in the course of construction shall not preclude rejection upon the discovery of defects previous to acceptance of the completed work.” It does not appear from the evidence that the officer in charge exceeded his authority, or that he was unfair or arbitrary in his inspections. The extra work of recutting the stone was paid for by the granite company and not by the plaintiff. The commandant furnished all of the wharf space he was able to provide, the specifications providing that: “ Unless otherwise specifically stated the party of the first part shall be allowed such reasonable space at the site of the work as the party of the second part is able to provide, and access to the same for receiving, hauling, storing, and working material.” The commandant allowed the plaintiff to exceed his limits whenever it was possible to do so, and in every way showed a desire to hasten the progress of the work by granting the use of all space available.
5. We come now to the plaintiff’s allegation as to the course of the engineer in charge of the work. This is the basis of this suit; all the other complaints of the plaintiff *11 are really based upon what he alleges to be the conduct of the officer in charge. The plaintiff characterizes the actions of this officer as “ unwarranted, unreasonable, and offensive,” and charges that the officer manifested toward the plaintiff personal antagonism. If these charges are true, if they are borne out by the evidence, then the plaintiff is entitled to some relief. Or if the plaintiff can establish the fact that his losses were caused by the action of the officer in charge he should be paid for them. It is true that during the progress of the work there were differences and misunderstandings between the plaintiff and the officer in charge of the work. He was arbitrary and overbearing in some instances. His conduct called forth a reprimand from his chief and the suggestion that he should have some one as a go-between between him and the plaintiff. But, notwithstanding this, in all essential particulars the officer in charge did not cause any loss or damage to the plaintiff. The misunderstandings were as to trival things; the arbitrary actions of the officer did not go to important matters and did not entail loss upon the plaintiff. And, while his overbearing manners were disagreeable and inexcusable, they were not the cause of the plaintiff’s losses. The officer in charge was an upright man, and his conduct can not be charged to bad faith, nor does the evidence sustain the charge of “ personal antagonism.”
It is hard to say just what caused the plaintiff to lose money on his contract. After it was over he found that he had lost and looked around for some way to recoup thesó' losses. He brought this suit, but it must be plain to anyone who has carefully examined the evidence that the causes of action set out are wholly speculative; and there is nothing in this record which would authorize the court to render a judgment against the defendants.
It follows that the petition must be dismissed as to all of the items, except the item of $2,000; shown to have been withheld by the defendants; and it is so ordered.
DowNev, Judge; BaeNet, Judge; Booth, Judge; and Campbell, Chief Justice, concur.